1  MCGUINN, HILLSMAN & PALEFSKY
   Cliff Palefsky, Bar No. 77683
2  cp@mhpsf.com
   Matthew Koski, Bar No. 262803
3  mkoski@mhpsf.com
   535 Pacific Avenue
4  San Francisco, California 94133
   Telephone: (415) 421-9292
5  Facsimile: (415) 403-0202

6  Attorneys for Plaintiff
   ALISON RUDAY
7

8                    UNITED STATES DISTRICT COURT

9           IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 ALISON RUDAY,                          | Case No.:

12              Plaintiff,                 | Judge:

13        vs.                             | Magistrate Judge:

14 CANYON VIEW CAPITAL INC., a California | **COMPLAINT**
   corporation,
15                                        | **JURY TRIAL DEMANDED**
                Defendant(s).
16

17

18

19

20

21

22

23

24

25

26

27

28

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT

1

## COMPLAINT

Plaintiff Alison Ruday ("Ruday" or "Plaintiff"), by and through her undersigned counsel, for her Complaint against Canyon View Capital Inc. ("CVC", "Company", or "Defendant"), states as follows:

### NATURE OF THE ACTION

1.      This is a federal diversity action involving statutory and common law claims arising under California law.  The action stems from Defendant's employment and termination of Plaintiff—a long-serving, high-performing, well-respected employee—*inter alia* in retaliation for Plaintiff repeatedly raising concerns regarding activities that she reasonably believed constituted potentially fraudulent/deceitful communications to CVC's employees and/or shareholders, as well as breaches of CVC's officers' and directors' fiduciary duties.

### PARTIES

2.      Plaintiff is an individual who is a citizen of the United States and domiciled in North Chatham, Massachusetts.

3.      Defendant CVC is a California corporation with its principal place of business in Santa Cruz, CA.

### JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendant are citizens of different states and more than $75,000 is in controversy.  Subsequent to her termination, but prior to the filing of this action, Plaintiff changed her domicile from California to Massachusetts.  She has obtained a Massachusetts driver's license, and has registered to vote and voted in Massachusetts.  She neither rents nor owns property in California and resides full-time with her fiancé in Massachusetts.  The combined value of Plaintiff's damages caused by Defendant's unlawful conduct exceeds $75,000.

5.      The Court has specific personal jurisdiction over Defendant because it has sufficient contacts with the state of California.  Plaintiff performed a substantial portion of her duties on Defendant's behalf in California, and Defendant's unlawful actions against Plaintiff

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

were undertaken from California.

6.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## **FACTS**

7.     Plaintiff was employed by CVC from around July 2012 until her termination, which became effective in early October 2020.  She was hired by CVC's Founder and Chief Executive Officer ("CEO") Robert Davidson ("Davidson") and worked closely with him for the entirety of her tenure at CVC.

8.     Plaintiff is an accomplished business professional, with decades of experience in sales, marketing, business development, customer/investor relationship management, leadership, consulting, and executive coaching.  Before joining CVC, Ruday already had a successful career: *inter alia* holding a variety of regional and national sales, executive, and management positions with FedEx; owning her own consulting company; and spending five years as a corporate executive coach and strategist.

9.     CVC is a privately-held investment company based in Santa Cruz, CA, which owns, manages, and operates on behalf of its hundreds of investors, a portfolio of multi-family real estate properties worth hundreds of millions of dollars.

### **Plaintiff's Exemplary Performance**

10.     In each role Plaintiff held while employed by CVC, she made vital contributions to the growth and success of the business.  She originally was hired for the position of Director of Communications & Investor Relations.  In that role her responsibilities included being the primary contact for all current and new investors, fundraising, customer relationship management ("CRM"), corporate and investor communications, public relations, marketing, branding, and investor on-boarding, in addition to all community and philanthropic involvement. In or around July 2014, she was promoted to the position of Vice President of Marketing & Investor Relations.  In that role she maintained the duties she had in her previous position, while also taking over leadership of CVC's business development efforts, as well as directing a number

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

of initiatives related to solidifying CVC's corporate culture.

11.     As a result of her high level of performance in that position, she was promoted again in or around January 2017 to the position of Executive Vice President and Chief of Staff. In that capacity, she served as the prime liaison between Davidson and CVC's President/Chief Financial Officer ("CFO") Gary Rauscher ("Rauscher").  She continued and maintained responsibility for all fundraising and client communications, implemented numerous company-wide wide policy and procedural initiatives across multiple corporate divisions, and provided leadership direction and education for CVC's senior directors related to employee motivation, corrective behavioral changes, and division re-organization.  In addition, she created and implemented multiple marketing, branding, corporate sponsorship, and communications vehicles to ensure the fluid dissemination of information to CVC's investors.  She also designed multiple, new recognition and appreciation programs for both CVC employees and investors.

12.     When Plaintiff joined CVC, it held approximately 1,450 apartments units in its investment portfolio.  At the time of her termination, and due in substantial part to her business development and fundraising efforts, it held just under 6,000 such units.  In addition, she facilitated and secured over $200 million of new investor equity over the course of her tenure with CVC, which supported more than double the total enterprise value of the company.  In fact, Plaintiff was closing new investors for CVC right up until the days preceding her unexpected and abrupt termination.

13.     Her singular contributions to the growth and success of CVC were confirmed on multiple occasions by Davidson, Rauscher, and numerous CVC investors.  For example, during a non-profit social fundraising event in early August 2019, Davidson informed her that he told a potential investor attending the event that "Ali makes me millions," further confirming her value to the firm.  As a result, Davidson confided in her on at least two occasions that he planned for her to take over the role of CEO of the company after him, describing her as "the heir apparent." In fact, mere days before her termination, Davidson told her that she could "have the job as CEO" if she wanted, along with whatever equity/compensation plan she wanted as well.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

Davidson told her to "just tell me what you want, and I will give it to you."

### Davidson's Unreliable & Potentially Fraudulent Valuations of CVC Employees' & Investors' Equity

14.     CVC maintains multiple investment entities in its portfolio in which Ruday has vested equity interests—CVC Equity Investors LLC ("CVC-2"), CVC 3 LLC ("CVC-3"), and the Davidson CVC Founder's Trust ("FT").  Ruday has a 5.25% equity interest in CVC-2 and a .85% interest in CVC-3.  As to the FT, Ruday had been accumulating "points" over the course of her employment at CVC, which translated to a vested percentage interest in the FT to which she is entitled as a beneficiary.  Further, the FT was presented to CVC's employees and investors by Davidson as being irrevocable.

15.     The value of Ruday's equity interests in CVC-2, CVC-3, and the FT flow from the master valuation of the CVC Balanced Fund ("Balanced Fund"), which then "waterfalls" into the various subsidiary investment entities maintained by CVC.  As such, the movement of the value of Ruday's equity interests would be expected the track the movement of the Balanced Fund.

16.     The respective operating agreements governing CVC-2 and CVC-3 designated Defendant CVC as the Managing Member for each entity and Plaintiff as a Member.  Under § 5.4(c) of both operating agreements, the Managing Member was under a "a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the other Members".

17.     In addition, under § 8.2 of the respective operating agreements for CVC-2 and CVC-3, each year, Defendant CVC as the Managing Member was required to prepare and provide Annual Reports to each of the Members that included: 1) a copy of the balance sheet for the entity; 2) a statement of income or loss for the entity; 3) a statement of each Member's Capital Accounts and any changes thereto; and 4) a statement of the entity's cash flow for that fiscal year.

18.     At no point did CVC or Davidson as its CEO provide such Annual Reports to Plaintiff.  Davidson would occasionally and informally share with Plaintiff and others

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

spreadsheets via a computer screen that ostensibly described the value of their respective equity in *inter alia* CVC-2 and CVC-3, but none of those sporadic offerings included the components of the Annual Reports required by the operating agreements.

19.     Davidson wielded complete control over the valuations of CVC's various investment entities.  This valuation methodology was the basis for calculating the quarterly earnings of all 300+ investors who had placed their money in CVC's funds.  He alone developed the methodology by which the valuations were determined.  He determined which properties owned by CVC would be included in the valuation calculations for the respective investment entities.  He decided which factors (e.g., cash flow, depreciation, rent increase percentages, discount values, etc.) would be included, and how each would be weighted, in the formulas he then used to calculate the valuations.  Davidson for years had refused to share the details in the form of official procedures regarding any aspect of his valuation method with anyone, even the other members of CVC's Executive Team—Ruday and Rauscher.  Ruday had asked for these procedures for years of Davidson and Davidson refused her requests, instead asserting he was the expert and she should not question him or his methods.

20.     Davidson's plenary control of, and the lack of transparency around, the valuations was a point of serious concern for Ruday.  Because Davidson was constantly altering or otherwise tweaking the underlying methodology and assumptions used, the valuations he produced could vary quite wildly at different times, without credible explanation or sourced references.  Rauscher, as CFO, confided to Ruday on several occasions that not only could he not follow or understand Davidson's spreadsheets, but he also did not trust Davidson's valuation numbers.  In fact, Rauscher told Ruday at one point that he had no documentation from Davidson that would protect Rauscher's family's ownership positions should something happen to Rauscher.  This made Ruday even more concerned about Davidson's spreadsheets.

21.     As Ruday was tasked with coordinating communications with CVC's investors and employees regarding the value of their respective investments, the consistency and integrity of the valuations was of paramount importance to her.  In addition, because of Davidson's

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

position and his own equity interests, there were legitimate concerns about conflicts of interest regarding valuations that were not subject to any independent oversight or third-party review, as well as the lack of clear, documented procedures to ensure that Davidson adhered to a consistent method of choosing and applying assumptions that would preserve the integrity of that methodology.

22.     This lack of transparency and oversight led to serious concerns that Davidson's valuations were inaccurate and potentially fraudulent, as evidenced by the following:

a.     In January 2020, in the context of responding to a request for information about CVC from a potential new investor who was a sophisticated financial professional, Rauscher expressed concern to Plaintiff about showing the potential investor Davidson's spreadsheets, as they could "cause her to discover errors or inconsistencies that may make her uneasy." This heightened Ruday's concerns even more, because Rauscher was unwilling to approach Davidson regarding the errors and inconsistencies in Davidson's valuations, and instead left it to Ruday to do so. This despite the fact that as CFO, it clearly was Rauscher's responsibility to ensure the accuracy and integrity of those valuations.

b.     An employee named David Smith ("Smith") was terminated by CVC in or around early March 2020. In paying out his equity and deciding the value to place upon it, Davidson wrote: "I've put a lot of effort into valuing David's interests and I'm surprised at how high the values are. I've checked my calcs over and over trying to beat up the values but I'm unable. I'm having trouble believing my own bull shit." This demonstrates how Davidson would intentionally manipulate the criteria and methodology used to calculate the value of CVC's employees'/investors' equity interests in the various investment entities.

c.     Further, because Smith was terminated before the close of the first Fiscal Quarter of 2020 ("Q1 2020"), the terms of the agreement(s) governing his (and other CVC employees') equity indicated that he should have been paid out based on the value of his equity at the close of previous Fiscal Quarter, i.e., Q4 2019. However, Davidson calculated Smith's equity based on its ostensible value at the close of Q1 2020. Davidson represented that he did so

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT

7

because he did not think his Q4 2019 numbers were accurate, which itself raises concerns about the integrity of Davidson's equity calculations.

d.      In or around June 2020, during an executive team call among Davidson, Rauscher, and Plaintiff, Davidson announced that he had altered his valuation methodology in such a way that resulted in an approximately 30% drop in the overall value of CVC Inc., another of CVC's investment entities.  During the call, Plaintiff challenged Davidson on his "new" valuation, but Davidson rebuffed her concerns.  Plaintiff subsequently expressed to Rauscher in a text message that Davidson had made the valuations too complex for him to continue to manage alone, and that if something did not change, sole control of the valuations might need to be taken away from Davidson altogether.  Rauscher responded that he "wouldn't poke the bear in that way."  This response further concerned the Plaintiff and she realized she would have to take the initiative to convince Davidson to allow a third party to have oversight of the valuation.

e.      Then, in July 2020, Davidson randomly sent emails to two CVC employees regarding the value of their respective interests in CVC-2, CVC-3, and the FT.  In those emails, Davidson wildly overstated the value of each employee's interests in CVC-2 and CVC-3.

f.      Plaintiff and Rauscher were cc'ed on the emails in question, and Plaintiff raised her concerns with Rauscher regarding the potential problems with sharing such inaccurate information.  Though Rauscher was reticent to raise the issue directly with Davidson, Plaintiff impressed upon him that as the CFO, he needed to do so.  At Plaintiff's urging, Rauscher sent Davidson an email seeking clarification regarding the equity values in the emails, and Plaintiff raised her concerns in a subsequent email and later verbal discussions with Davidson and Rauscher.  Plaintiff outlined to Davidson that her FT values from years 2018 and 2019, which had been previously published by CVC to Plaintiff, were significantly higher than what he was then claiming Plaintiff's Q1 2020 values were, further underlining the discrepancies in Davidson's valuations.  She asked that Davidson adhere to previously agreed upon procedures for sharing such data with employees, to avoid circulating incorrect amounts, which potentially

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

could expose CVC to liability if ever challenged.  Plaintiff asked Davidson to rectify the situation with the two employees and Davidson begrudgingly did so.

g.      In addition, Plaintiff paid $50,000.00 to purchase additional shares in CVC-2 upon the termination of another former CVC employee in or around 2016.  She never was provided any documentation regarding the actual value of the shares she purchased. Davidson later admitted in writing to her that he had "not put much effort into calculating the shares' value", further undermining the reliability and integrity of his valuation calculations.

h.      Further, in July 2020, Davidson offered, in writing, to the Plaintiff the option to purchase 1,000 shares in CVC, Inc. at the price of $1,609.00 per share, as described in the terms of an Incentive Stock Option ("ISO") plan document sent by Davidson to Plaintiff and Rauscher in July 2020.  Rauscher was tasked with obtaining counsel to prepare the ISO for these shares for Plaintiff, but he delayed doing so up until the time Ruday was terminated.  As with her vested equity, there are serious concerns that the price per share quoted to her by Davidson is inaccurate and unreliable.

i.      Davidson's valuations of CVC-2 and CVC-3 during the last months of Plaintiff's tenure fluctuated wildly, either without credible explanation or based on justifications that imply that Davidson previously had been sharing potentially fraudulent valuations with employees and investors, and each time to Plaintiff's detriment.

j.      On or around September 9, 2020, Davidson shared a spreadsheet with Plaintiff and Rauscher stating that Plaintiff's interest in CVC-2 was $780,953.00 and CVC-3 was $74,099.00 as of Q2 2020.  When Rauscher suggested in reply that the value of the FT "looks low," Davidson responded that he needed to make some adjustments and re-circulate the valuations.  Then, on or around September 10, 2020, Davidson circulated another spreadsheet, this one asserting that somehow Plaintiff's equity interests in CVC-2 and CVC-3 as of Q2 2020 had precipitously dropped in value to $522,962.00 and $24,745.00, respectively.

k.      Rauscher's equity also dropped drastically in the September 10 spreadsheet, with his CVC-2 interest decreasing from $929,706.00 to $622,574.00.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT

9

l.      By contrast, the Balanced Fund increased in value over the same quarter ending September 30, 2020, which is completely inconsistent with Davidson's diminishing valuations of Plaintiff's equity positions.  Because of the manner in which the valuation of the Balanced Fund "waterfalls" into the subsidiary ownership equity positions, there would be no credible explanation for the Balanced Fund increasing in value at the same time that CVC-2, CVC-3, and the FT decreased.

23.      Ruday repeatedly raised concerns with Davidson regarding his valuations.  For years, she had pressed Davidson to bring on an independent entity to develop, write a procedure document, or at least audit, CVC's valuation procedures, which did not exist even after her request for this process.  This would ensure there was transparency, consistency, and integrity in the methodology and formulas used to make the various calculations, and also address any issues regarding conflicts of interest.  As Ruday wrote to Davidson in June 2020, it was "critical that we can continue with this valuation process in an accurate and importantly, defendable way in case we have client contention and to also mitigate any conflicts of interest, as you have outlined, are key issues with regard to any valuations."  Davidson, who always had thought of himself as more of an analyst than a traditional CEO—and therefore was quite possessive of his spreadsheets and the methodology used to create them—was highly resistant to this.  Many times over the years, Plaintiff brought her request to Rauscher, as CFO, for an independent party and/or other real estate valuations analyst to, at minimum, review Davidson's valuation model, assumptions, and methodology.  While Rauscher agreed this was needed, he was unwilling to broach the subject with Davidson, citing that Davidson would never allow it, writing on one occasion "I have NO IDEA how we would get him to let anyone touch his baby."

24.      In addition, Plaintiff had endeavored to put procedures in place for communicating with employees and/or investors regarding their equity interests.  Davidson's disregarding of these procedures—and his regular, unaccountable altering of the valuations—created potentially serious problems related to inaccurate or potentially fraudulent information being transmitted.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT

10

**Davidson's Pattern of Inappropriate Behavior Towards Plaintiff Based on Sex & His Failure to Complete Legally-Required Workplace Harassment Training**

25.     Davidson also repeatedly directed offensive or otherwise inappropriate behavior towards Plaintiff.

26.     For example, Davidson kept numerous images of nude women on the laptop computer he used at work.  He set up the screensaver on his laptop in such a manner that it would scroll through and display many such images in succession during business meetings. When the screen saver would engage and begin showing these images, Davidson, on multiple occasions would turn his screen around to make a point of showing the images to her.

27.     When he would do so, Ruday would complain that such images were completely inappropriate and that she believed it constituted sexual harassment and created a hostile work environment to effectively shove such lewd and pornographic images into the faces of one's employees, and in particular to direct such behavior at a female subordinate. She also stated that there were other female employees in the office, as well as CVC clients who would be offended should these photos be displayed during meetings.   In response, Davidson would dismiss and rebuff her complaints, often by saying that she was "no fun."  He continued to engage in such behavior notwithstanding her repeated complaints about it.

28.     She informed Rauscher many times of the photographs on Davidson's screen saver, as well as other instances of inappropriate behavior from Davidson.  For example, Davidson on multiple occasions would place his hands on her back during company events, and would continue to do so even after she pulled back or otherwise tried to move away from him.

29.     Rauscher did nothing about it—even though he often witnessed it—but agreed privately with Ruday that Davidson's behavior was inappropriate and often directed solely at Ruday.  At the time, CVC's Human Resources ("HR") & Operations Coordinator, Nicole ("Nikki") Rauscher, reported directly to Rauscher, and also was/is his spouse.

30.     Davidson also failed to respect personal and professional boundaries with Plaintiff in ways that he never did with Rauscher, her male peer in the company.  For example, Davidson would often become belligerent when Ruday raised questions about his valuations, slamming his

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

hands onto the desk and belittling her in meetings in which Rauscher also was present.  In one such, meeting, Davidson's belligerence was so extreme that it brough Plaintiff to tears.

31.     Davidson also would barge into private meetings Ruday was holding with actual or potential investors or clients or employees and interrupt her discussions with them, in a way that embarrassed her and undermined her credibility.  He never engaged in similar behavior toward Rauscher.

32.     Further, beginning in or around the spring of 2020, all CVC employees, including Davidson, were informed that they were required to complete a legally-mandated harassment training course before June 15, 2020.  Despite receiving numerous reminders from HR to do so, Davidson did not complete the training.

33.     Plaintiff sent emails in the weeks leading up to her termination informing Nikki Rauscher in HR that Davidson had still not taken the harassment training, even after HR instructed him several times by email to do so.  HR informed Ruday that she would "again" send Davidson the invitation to take the training.

**Plaintiff Develops a Serious Medical Condition**

34.     In or around March 2020, in response to the growing COVID-19 pandemic, Plaintiff began working remotely from Massachusetts, which she had done for limited periods on multiple previous occasions during the preceding years, without any detrimental effect on her or the company's performance.

35.     About one month later, in April 2020, she began experiencing severe pain in her neck and right shoulder, which also radiated down her right arm and fingers.  In or around late April 2020, she informed Rauscher during a telephone meeting about the pain she was experiencing.  The pain prevented her from sitting, as well as using a keyboard and/or computer mouse for extended periods without breaks.  Fortunately, working remotely during COVID allowed her to sufficiently take breaks and complete her workload.   In May 2020, she informed Davidson and Rauscher via email that she was continuing to experience serious pain in her "neck, now both shoulders and arms."

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

36.     The pain grew more excruciating over the ensuing months, leading her to consult an orthopedic surgeon in or around late June 2020.  The surgeon identified that she had both herniated discs and bone spurs pressing on the nerves inside her cervical spine, which was causing the numbness and pain she had been experiencing.  She was prescribed anti-inflammatory medication and—because the COVID-19 pandemic prevented her from having in-person appointments with a chiropractor—purchased and began regularly using a home traction machine.  She informed Nikki Rauscher of her condition and ongoing treatment.  She also updated Davidson and Rauscher regarding her condition.

37.     In or around early July 2020, an MRI confirmed the surgeon's initial diagnosis, and based on the instructions of her doctor, Plaintiff began a course of regular physical therapy, weekly targeted massages, and daily use of the home traction machine.  She informed Davidson, Rauscher, and HR of the results of her MRI and prescribed physical therapy regimen.  All of her physical therapy appointments were included in her online work calendar, so Davidson, Rauscher, HR, and her direct reports were aware of the times when she would be unavailable.

38.     Also between July and September 2020, Plaintiff began experiencing sciatica, which resulted in severe pain in her lower back.  The pain prevented her from sitting for extended periods of time and made taking even short walks extremely painful.  Despite her substantial discomfort, she continued working as best she could, taking breaks as needed, which allowed her to continue performing at or above expectations while undergoing treatment.  She held weekly check-in calls with HR and her direct reports to provide regular updates regarding her ongoing conditions as well as discuss other business matters.

**Plaintiff's Condition Worsens & Rauscher "Resigns"**

39.     On or around September 16, 2020, Plaintiff visited her doctor, who referred her to a pain management specialist to discuss pain relief, medication, and the possibility of having an epidural to help alleviate her ongoing severe pain.  Her doctor also ordered an MRI for her lower back, and they discussed for the first time the possibility that she may require neck surgery to address the underlying causes of her pain.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT

13

40.     Facing potential surgery was quite daunting and distressing for Plaintiff.  After this appointment, she sent an email to Davidson and Rauscher, telling them that she may require neck surgery, but that she wanted to try other treatment options, in the hopes of avoiding surgery. She informed them that she nevertheless might need to take some time away from work.

41.     On the same day she sent this email, and unbeknownst to her, Rauscher informed Davidson that he intended to resign from the company.  In a subsequent conversation with Rauscher, he confided to Ruday that one reason he decided to resign when he did was because of the drastic drop in the value of his equity in the spreadsheets Davidson circulated on September 9 and 10.  Rauscher told her that he did not want to give Davidson another chance to change the valuations again, as they had finally gotten Davidson to give them their equity positions in writing.

### Davidson is Concerned About the Business (Not Plaintiff's Health) & Demands Plaintiff Fly to California at the Height of the Covid-19 Pandemic

42.     Plaintiff subsequently spoke to Davidson on the telephone on or around both September 17 and 18, 2020.  During both calls, Davidson expressed his concern that her health conditions will detrimentally affect the company's performance.  He also asked her on each call to return to California immediately to handle Rauscher's transition, scheduled over the next 90 days.

43.     In response, Plaintiff informed him that, as he was well aware, traveling on a transcontinental flight would have been extremely painful for her, could have made her already serious medical conditions worse, would take her out of her prescribed treatment plan with her doctor, physical therapists, and other professionals, and would also place her at elevated risk for contracting Covid-19 at the height of the pandemic.  She told him that she would do whatever she could to ensure a smooth transition for Rauscher and help Davidson chart a course for the company going forward.

/ / /

/ / /

/ / /

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

**Plaintiff and Davidson Discuss Their Plans for CVC in the Wake of Rauscher's Impending Departure and Ruday Reiterates Her Concerns Regarding Potentially Fraudulent Valuations**

44.     In the course of that part of their September 18 call, the discussion again turned to Plaintiff's and Davidson's respective roles in CVC moving forward.  They discussed the fact that because of his background, Davidson always had envisioned himself as more of an analyst than a traditional CEO.  They discussed the types of responsibilities that CEOs traditionally have—e.g., setting a strategic vision for the company, sharing that vision with the organization, directing that systems and structures are put in place to support the staff to do their part in implementing and achieving their goals in the context of the company's broader strategic goals, acting as the "face" of the organization, etc.—and Davidson admitted that Plaintiff was the one who already did those things for CVC, even if she did not have the official title.  "You are the CEO, you do all that for us now, you've got the job," he said.  Plaintiff agreed and expressed her excitement to Davidson, as they had been discussing taking this step for years.  It is why Plaintiff had focused so much in recent years on tightening up various aspects of CVC's business.

45.     Then the conversation took an ominous turn.  Davidson's demeanor changed dramatically and he began speaking very sharply and condescendingly to Plaintiff, much as an adult would lecture and intimidate a child.  He told her that even though she would be CEO, that he was the "top analyst," and the CEO needed to "listen to the top analyst" and "believe in and trust and not question" the valuation numbers he presented in his spreadsheets.  Plaintiff responded that she always had and always would listen to him, and review his valuations with an open mind, but in light of the constant fluctuations in the values presented in various iterations, she had legitimate concerns about the accuracy and legitimacy of Davidson's valuations, and had a responsibility to CVC, its employees, and its investors to make sure they are not fraudulent.  That is why, she said, it was so important to bring in a third-party valuation firm.  Moreover, she reiterated the fact that because of Davidson's position, there were serious concerns related to his conflicts of interest.  Davidson should be reviewing valuations provided by an independent, outside company, not performing the valuations himself without oversight.  Checks and balances were desperately needed.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

46.     Davidson did not like hearing this.  It is clear that his offer to officially promote Plaintiff to CEO was contingent on her changing her position regarding instituting independent, transparent oversight over the valuation process, and for her to stop challenging his potentially fraudulent valuations.  Davidson knew that such oversight would expose his potentially fraudulent activities or incompetency regarding the valuations, and if Plaintiff actually were the CEO, she would have the authority to impose it, for the good of the company.

47.     At the end of that call, Ruday asked Davidson, "So, should I order business cards?"  His response was, "not quite yet, the actual title may be different, like President."  This was concerning, as the call had been completely focused on Ruday moving into the CEO role, and only changed direction when she challenged Davidson's mandate that Ruday accept his valuations without question.

**Davidson Again Demands that Plaintiff Risk Her Health by Flying to California**

48.     On or around September 23, 2020, Plaintiff had another telephone call with Davidson and Rauscher.  Before Rauscher entered the call, Davidson began the call by angrily demanding again that she travel to California immediately.  In response, she again reminded Davidson that such a trip could seriously endanger her health, and also would prevent her from pursuing the treatment options she had in place to help her avoid surgery.  Despite her explanations, Davidson continued to aggressively pressure her to return to California during the call, to the point that the stress and attendant pain he was causing her prevented her from continuing with the call.

49.     In response to Davidson's treatment of Plaintiff during the September 23, 2020 call, Rauscher sent Ruday a text message that evening stating that he was "not sure [Davidson] will ever change.  I would have thought this news [Rauscher's resignation] would have caused him to soften up a bit."

50.     At or around the same time, Plaintiff was asked, in her capacity as a director of CVC, Inc., to affirm that it was in CVC's best interest to guarantee a loan for a personal airplane for Davidson, despite the fact that, at the time, CVC Inc. had not secured Directors & Officers

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

("D&O") liability insurance to protect them before placing CVC (and potentially Plaintiff) at serious financial risk regarding Davidson's personal expenses.  Plaintiff opposed placing CVC, herself, and CVC's other officers/directors at such risk, particularly in the absence of D&O insurance.  She instead resigned her position as a director, permitting the loan guarantee to proceed.

51.     On the following day, Davidson and Rauscher had an approximately 3-hour lunch meeting, which is not something they ever did before.  Later that evening, Plaintiff spoke to Rauscher on the telephone.  She explained to him her concerns about acquiescing to Davidson's repeated demands that she travel to California, and her frustration that Davidson did not seem to care about her well-being.  She told him that her underlying medical conditions made traveling dangerous on multiple fronts, as she not only would be risking worsening her medical conditions and pain, but also that in light of the seriousness of the Covid-19 pandemic at the time, it was a particularly dangerous time for anyone to fly, much less someone at elevated risk for contracting it.  Rauscher agreed and told her he did not understand why Davidson refused to stop pressuring her to do something that put her health in jeopardy.  Plaintiff asked Rauscher whether and to what extent she was discussed during his lunch meeting with Davidson.  Rauscher hesitated and said they did not discuss her much, which in light of subsequent events is highly unlikely.

**Defendant Terminates Plaintiff in Retaliation for Her Complaints**

52.     Davidson and Plaintiff subsequently made plans to speak by telephone on September 26, 2020.  She was in substantial pain, and asked Davidson to be considerate of that, but did her best to persevere through what ended up being a 1.5 hour call.  She began the call by asking Davidson to stop verbally attacking her during the regular course of business in order to support a more positive and productive work environment, as she had requested from him on several occasions in the past.

53.     During this meeting, Davidson also revealed to Plaintiff that despite his representations to CVC's employees that the FT was irrevocable, he had inserted a "secret clause" in it that would allow him revoke it at any point during his life, stating "I can call the

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

trustee from my deathbed and tell her to cancel the Trust and give it all to my family" and that he was now considering doing so, which would result in CVC's employees being stripped of all of their hard-earned equity.  In response, Ruday expressed shock and dismay to Davidson at his dishonest representation of the FT.

54.    After Davidson asked Plaintiff a number of questions regarding the plan she was preparing for Rauscher's impending transition and her ideas for the company's direction going forward, Davidson abruptly ended the call by terminating her employment effective immediately, telling her she just "wasn't fun" anymore, which reminded her of what he would tell her when she complained about his sexually inappropriate behavior.  She asked him if his plan all along was to fire her, even before he knowingly put her through a long, excruciating call. He replied that it was, and he just wanted to use the call as an "exit interview" to get all of her ideas of how to run the company going forward.  Pursuant to Plaintiff's separation paperwork, her termination became effective on October 5, 2020 (i.e., in Q4 2020).

55.    Further, and despite his earlier announcement that he would be "resigning," Rauscher currently remains employed by CVC.  In light of: 1) Davidson and Plaintiff's September 18 discussion regarding her promotion to CEO, and Davidson's clear implication that it was contingent on Plaintiff ceasing to raise concerns regarding his potentially fraudulent valuations; 2) Davidson and Rauscher's out-of-the-ordinary 3-hour lunch meeting on September 24; 3) Davidson's termination of Plaintiff on September 26 (effective October 5th); and 4) Rauscher's apparent 180-degree turn regarding his "resignation," Plaintiff believes that Rauscher accepted the terms from Davidson that she would not, e.g.,  stop opposing Davidson's erratic, unreliable, and potentially fraudulent practices regarding the valuations.  This was consistent with Rauscher's general reluctance to raise issues with regard to the valuations directly with Davidson, absent Plaintiff's prodding, as described above.  As he wrote to Plaintiff when she raised concerns about Davidson back in June of 2020, he wouldn't "poke the bear in that way." Ergo, Davidson fired Plaintiff and kept Rauscher.

56.    On February 26, 2021, Plaintiff filed a complaint with the California Department

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

of Fair Employment and Housing ("DFEH") concerning her claims that CVC discriminated and retaliated against her in violation of the California Fair Employment and Housing Act ("FEHA"), and received a Right to Sue Letter from DFEH the same day.

57.     On or around September 13, 2021, Davidson without notice sent Plaintiff a letter on behalf of CVC.  In the letter, he represented that CVC had repurchased her interests in CVC-2 and CVC-3 for $408,520.00 (reduced by the amount of a promissory note Plaintiff had with CVC from the initial purchase of her equity interest in CVC-2) and $8,010.00, respectively, based on Q2 2020 values.  CVC included checks for the repurchase in its letter to Plaintiff, but neither sought/secured Plaintiff's assent to a repurchase agreement nor attempted to obtain her consent in any way, before effectuating the transfer of her equity back to CVC.

58.     As a member of CVC-2 and CVC-3, Plaintiff had equity interests in each respective fund equaling a percentage of the total value of the fund.  These equity interests were the Plaintiff's property—unless and until they were redeemed in accordance with §§ 10.10 and 10.11 of the operating agreements for the respective funds.

59.     To redeem Plaintiff's equity, CVC was required as the Managing Member of both CVC-2 and CVC-3 pursuant to § 10.11(a) of each operating agreement, to determine the value of Plaintiff's interests in each fund within thirty (30) days of her termination, and calculate the value of her interests as of the end of the fiscal quarter ending immediately prior to her termination (i.e., Q3 2020).  It was further required pursuant to § 10.10(c) to exercise its option to repurchase Plaintiff's equity within a further thirty (30) days from the date it determined the value of Plaintiff's equity interests.

60.     Instead of abiding by the aforementioned terms of the respective operating agreements, CVC unilaterally transferred Plaintiff's equity interests in CVC-2 and CVC-3 back to itself in or around September 2021.  CVC sent Plaintiff checks for Plaintiff's interests in CVC-2 and CVC-3 for improper amounts, calculated the value of her interests based on the wrong fiscal quarter (i.e., Q2 2020), did not execute a repurchase agreement with Plaintiff, and effectuated the transfer of Plaintiff's equity interests without her consent.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

### FIRST CAUSE OF ACTION
### Retaliation
### (Cal. Lab. Code § 1102.5)

61.     Plaintiff incorporates the allegations of ¶¶ 1 through 60 above as if set forth in full herein.

62.     Cal. Lab. Code § 1102.5 prohibits employers from retaliating against an employee for disclosing information to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

63.     To qualify for whistleblower protection under § 1102.5(b), one is not required to use any "magic words" or refer specifically to any particular provision of law. *Ross v. County of Riverside* (2019) 36 Cal. App. 5th 580, 592–93 ("Although Ross did not expressly state in his disclosures that he believed the County was violating or not complying with a specific state or federal law, Labor Code section 1102.5, subdivision (b), does not require such an express statement.  It requires only that an employee disclose information and that the employee reasonably believe the information discloses unlawful activity.")

64.     Plaintiff satisfied this standard by repeatedly raising concerns to Davidson and Rauscher regarding activities that she reasonably believed constituted potentially fraudulent/deceitful communications to CVC's employees and/or shareholders, as well as breaches of CVC's officers' and directors' fiduciary duties, as codified at *inter alia* California Civil Code §§ 1572, 1573, and 1710; and California Corporations Code § 309 and 17704.09.

65.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered damages including, but not limited to, a loss of income and other benefits from Defendants.  Further, Plaintiff has suffered emotional distress and other general damages.

66.     In doing the things alleged herein, Defendant's conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

## SECOND CAUSE OF ACTION
**Medical Condition Discrimination, Failure to Engage in the Interactive Process, and Failure to Accommodate Plaintiff's Medical Condition in Violation of the California Fair Employment and Housing Act (FEHA)**
**(Cal. Govt. Code § 12940)**

67.    Plaintiff incorporates the allegations of ¶¶ 1 through 66 above as if set forth in full herein.

68.    Under Govt. Code § 12940(a), it is unlawful for an employer to terminate a person, or to otherwise discriminate against a person in the terms, conditions or privileges of employment, because of that person's medical condition.

69.    Under Govt. Code § 12940(m), it is unlawful for an employer to "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee," unless the employer demonstrates doing so would impose an "undue hardship."

70.    Under Govt. Code § 12940(n), it is unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a . . . known medical condition."

71.    Defendant failed to engage in a timely, good faith, interactive process with Plaintiff when she notified Defendant of her medical condition and need for remote work, and failed to reasonably accommodate Plaintiff's medical condition when Davidson repeatedly demanded that Plaintiff fly to California, despite knowing that doing so likely would seriously exacerbate her condition and undermine her ongoing medical treatment.

72.    Plaintiff had demonstrated clearly that she was able to perform the essential functions of her position working remotely.  Allowing her to continue performing her duties remotely would have caused no hardship to CVC, undue or otherwise.

73.    Defendant discriminated against Plaintiff because of her medical condition when Davidson terminated her because of her refusal to acquiesce in his demand that she place her health in jeopardy by flying across the country at his command.

74.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

suffered damages including, but not limited to, a loss of income and other benefits from Defendants.  Further, Plaintiff has suffered emotional distress and other general damages.

75.     In doing the things alleged herein, Defendant's conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRD CAUSE OF ACTION
**Retaliation for Opposing a Hostile Work Environment Based on Gender**
**(Cal. Govt. Code § 12940)**

76.     Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 75 as if fully set forth herein.

77.     Under Govt. Code § 12940(h), it is unlawful for an employer to terminate, or to otherwise discriminate against, a person because the person opposed forbidden practices, such as the imposition of a hostile work environment based on sex or gender.

78.     Through Davidson's repeated and brazen display of pornographic images on his computer's screen saver, his refusal to cease displaying those images even after Plaintiff repeatedly asked him to do so, and his inappropriate physical touching of Plaintiff during company events, CVC subjected Plaintiff to a work environment that was permeated with gender-based intimidation, ridicule, and insult, which was sufficiently severe or pervasive to alter the terms of Plaintiff's employment and create and abusive working environment, in violation of Govt. Code § 12940(j).

79.     By terminating Plaintiff in part because she opposed the gender-based hostile work environment created and perpetuated by Davidson—as well as for her repeated attempts to get Davidson to complete the harassment training required by California law—CVC retaliated against her in violation of Govt. Code § 12940(h).

80.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered damages including, but not limited to, a loss of income and other benefits from Defendants.  Further, Plaintiff has suffered emotional distress and other general damages.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

81.     In doing the things alleged herein, Defendant's conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FOURTH CAUSE OF ACTION
### Wrongful Termination in Violation of Public Policy

82.     Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 81 as if fully set forth herein.

83.     It is the public policy of the State of California to prohibit employers from discharging employees in a discriminatory manner, including on account of an employee's medical condition, or engaging in a protected activity (e.g., opposing a hostile work environment, and/or opposing potentially fraudulent or otherwise unlawful activities).  These public policies are embodied in, *inter alia*, Cal. Govt. Code §12940; Cal. Lab. Code § 1102.5; Cal. Civ. Code §§ 1572, 1573, and 1710; and Cal. Corporations Code §§ 309 and 17704.09.

84.     Plaintiff was discriminated against because of her medical condition and denied reasonable accommodations.  She was retaliated against and subsequently terminated for opposing a gender-based hostile work environment and opposing Davidson's potentially fraudulent activities related to the valuations of CVC's various investment entities.  Defendants thereby terminated her in violation of public policy.

85.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered damages including, but not limited to, a loss of income and other benefits from Defendants.  Further, Plaintiff has suffered emotional distress and other general damages.

86.     In doing the things alleged herein, Defendants' conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

/ / /

/ / /

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

## FIFTH CAUSE OF ACTION
### Breach of Contract

87.     Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 86 as if fully set forth herein.

88.     The respective operating agreements governing CVC-2 and CVC-3 designated Defendant CVC as the Managing Member for each entity and Plaintiff as a Member.  Under § 5.4(c) of each both operating agreements, the Managing Member was under a "a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the other Members".

89.     In addition, under § 8.2 of the respective operating agreements for CVC-2 and CVC-3, each year, Defendant CVC as the Managing Member was required to prepare and provide Annual Reports to each of the members that included: 1) a copy of the balance sheet for the entity; 2) a statement of income or loss for the entity; 3) a statement of each Member's Capital Accounts and any changes thereto; and 4) a statement of the entity's cash flow for that fiscal year.

90.     At no point did CVC or Davidson as its CEO provide such Annual Reports to Plaintiff.  Davidson would occasionally and informally share with Plaintiff and others spreadsheets that ostensibly described the value of their respective equity in *inter alia* CVC-2 and CVC-3, but none of those sporadic offerings included the components of the Annual Reports required by the operating agreements.  By failing to provide the Annual Reports as required by the operating agreements governing CVC-2 and CVC-3, Defendant breached those agreements.

91.     By subsequently providing Plaintiff with erratic, unreliable, and potentially fraudulent valuations of Plaintiff's equity interests in CVC-2 and CVC-3—and doing so only after Plaintiff complained about the unexplained fluctuations, inaccuracies, and potentially fraudulent figures contained in Davidson's valuations—Defendant breached its contractually-mandated fiduciary duty to Plaintiff.

92.     Further, as a member of CVC-2 and CVC-3, Plaintiff had equity interests in each respective fund equaling a percentage of the total value of the fund.  The process whereby CVC

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

could exercise its option to repurchase Plaintiff's equity upon her termination was governed by §§ 10.10 and 10.11 of the operating agreements for the respective funds.

93.     To repurchase Plaintiff's equity, CVC was required as the Managing Member of both CVC-2 and CVC-3 pursuant to § 10.11(a) of each operating agreement, to determine the value of Plaintiff's interests in each fund within thirty (30) days of her termination, and calculate that value based on the quarter immediately prior to her termination (i.e., Q3 2020).  It was further required pursuant to § 10.10(c) to exercise its option to repurchase Plaintiff's equity within a further thirty (30) days from the date it determined the value of Plaintiff's equity interests.

94.     Instead of abiding by the aforementioned terms of the respective operating agreements, CVC unilaterally transferred Plaintiff's equity interests in CVC-2 and CVC-3 back to itself in or around September 2021, well outside the contractually-mandated time for doing so. CVC sent Plaintiff checks for Plaintiff's interests in CVC-2 and CVC-3 for improper amounts, calculated those amounts based on the wrong fiscal quarter (i.e., Q2 2020), did not execute a repurchase agreement with Plaintiff, and effectuated the transfer of Plaintiff's equity interests without her consent.  In doing so, Defendant breached its contractual duties to Plaintiff.

95.     Plaintiff has suffered damages proximately caused by Defendant's breach, in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Cal. Corp. Code § 17704.09)**

96.     Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 95 as if fully set forth herein.

97.     In addition to the contractual duties owed under the terms of the operating agreements, CVC owed the other members of the entities, including Plaintiff, duties of care and loyalty.  Further, in discharging its duties to the other members, including Plaintiff, CVC as the Managing Member was required to refrain from *inter alia* reckless conduct, intentional misconduct, or a knowing violation of the law.  Cal. Corp. Code § 17704.09(a), (c).

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

98.    By *inter alia* failing to provide Plaintiff with the required Annual Reports, and by providing Plaintiff with erratic, unreliable, and potentially fraudulent valuations of Plaintiff's equity interests in CVC-2 and CVC-3—and doing so only after Plaintiff complained about the unexplained fluctuations, inaccuracies, and potentially fraudulent figures contained in Davidson's valuations—Defendant breached its fiduciary duties to Plaintiff.

99.    Further, as a member of CVC-2 and CVC-3, Plaintiff had equity interests in each respective fund equaling a percentage of the total value of the fund.  The process whereby CVC could exercise its option to repurchase Plaintiff's equity upon her termination was governed by §§ 10.10 and 10.11 of the operating agreements for the respective funds.

100.   To repurchase Plaintiff's equity, CVC was required as the Managing Member of both CVC-2 and CVC-3 pursuant to § 10.11(a) of each operating agreement, to determine the value of Plaintiff's interests in each fund within thirty (30) days of her termination, and calculate that value based on the quarter immediately prior to her termination (i.e., Q3 2020).  It was further required pursuant to § 10.10(c) to exercise its option to repurchase Plaintiff's equity within a further thirty (30) days from the date it determined the value of Plaintiff's equity interests.

101.   Instead of abiding by the aforementioned terms of the respective operating agreements, CVC unilaterally transferred Plaintiff's equity interests in CVC-2 and CVC-3 back to itself in or around September 2021, well outside the contractually-mandated time for doing so. CVC sent Plaintiff checks for Plaintiff's interests in CVC-2 and CVC-3 for improper amounts, calculated those amounts based on the wrong fiscal quarter (i.e., Q2 2020), did not execute a repurchase agreement with Plaintiff, and effectuated the transfer of Plaintiff's equity interests without her consent.  In doing so, Defendant breached its fiduciary duties to Plaintiff.

102.   Plaintiff has suffered damages proximately caused by Defendant's breach, in an amount to be proven at trial.

103.   In doing the things alleged herein, Defendant's conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION
### Conversion

104.    Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 103 as if fully set forth herein.

105.    As a member of CVC-2 and CVC-3, Plaintiff had equity interests in each respective fund equaling a percentage of the total value of the fund.  These equity interests were the Plaintiff's property—unless and until they were redeemed in accordance with §§ 10.10 and 10.11 of the operating agreements for the respective funds.

106.    To redeem Plaintiff's equity, CVC was required as the Managing Member of both CVC-2 and CVC-3 pursuant to § 10.11(a) of each operating agreement, to determine the value of Plaintiff's interests in each fund within thirty (30) days of her termination, and calculate that value based on the quarter immediately prior to her termination (i.e., Q3 2020).  It was further required pursuant to § 10.10(c) to exercise its option to repurchase Plaintiff's equity within a further thirty (30) days from the date it determined the value of Plaintiff's equity interests.

107.    Instead of abiding by the aforementioned terms of the respective operating agreements, CVC unilaterally transferred Plaintiff's equity interests in CVC-2 and CVC-3 back to itself in or around September 2021.  CVC sent Plaintiff checks for Plaintiff's interests in CVC-2 and CVC-3 for improper amounts, calculated those amounts based on the wrong fiscal quarter (i.e., Q2 2020), did not execute a repurchase agreement with Plaintiff, and effectuated the transfer of Plaintiff's equity interests without her consent.

108.    Plaintiff has been harmed by CVC's conversion of her property, in an amount to be proven at trial, and CVC's actions were a substantial factor in causing that harm to Plaintiff.

109.    In doing the things alleged herein, Defendant's conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief, as follows:

A.       For judgment in favor of Plaintiff and against Defendant;

B.       For economic, compensatory, and punitive damages in an amount to be proven at trial;

C.       For costs of suit to the extent allowed by law, and attorneys' fees pursuant to Cal. Lab. Code § 1102.5 and Cal. Govt. Code § 12965;

D.       For prejudgment interest to the extent allowed by law; and

E.       For such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff ALISON RUDAY hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 4, 2022                           MCGUINN, HILLSMAN & PALEFSKY
                                                Cliff Palefsky
                                                Matthew Koski


                                        By: _/s/ Cliff Palefsky_
                                                Cliff Palefsky
                                                Attorneys for Plaintiff
                                                Alison Ruday

McGuinn, Hillsman
& Palefsky
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

COMPLAINT

28